# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOSHUA J. ANGEL, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2019-0235-SG |
| WARRIOR MET COAL INC., APOLLO MANAGEMENT LLC, ARES MANAGEMENT LLC, CASPIAN CAPITAL LP, FIDELITY INVESTMENTS, FRANKLIN MUTUAL ADVISORS LLC, GSO CAPITAL PARTNERS LP, and KKR CREDIT ADVISORS (US) LLC, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Date Submitted:  March 16, 2021
Date Decided:  June 30, 2021

Julia B. Klein, of KLEIN LLC, Wilmington, Delaware, *Attorneys for Plaintiff Joshua J. Angel.*

Matthew F. Davis and Justin T. Hymes, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Stephen M. Baldini, Brian Carney, and Stephanie Lindemuth, of AKIN GUMP STRAUSS HAUER & FELD LLP, New York, New York, *Attorneys for Defendants Warrior Met Coal, Inc., Apollo Management LLC, Ares Management LLC, Caspian Capital LP, Fidelity Investments, Franklin Mutual Advisors LLC, GSO Capital Partners LP, and KKR Credit Advisors (US) LLC.*

**GLASSCOCK, Vice Chancellor**

The Plaintiff here received a right to acquire equity in a Delaware limited liability company (an "LLC") via a bankruptcy court order. He failed to file paperwork required by the LLC to receive the equity; his right was forfeited accordingly. Per the Plaintiff, he did not receive notice sufficient to the exercise of his rights. He now brings a litany of claims against some, but not all, of the parties involved in implementing the bankruptcy court order; with these claims, he seeks to frame his loss as a remediable impoverishment. As I explain in more detail below, all but one of his attempts must fail.

This matter involves the bankruptcy of a coal company, Walter Energy, Inc. ("Debtor"). The Plaintiff, Joshua Angel, was a holder (a "Lienholder") of the Debtor's first lien debt. An *ad hoc* steering committee (the "Steering Committee") composed of other such Lienholders—including all the Defendants here, with the exception of Warrior Met Coal Inc. ("Warrior, Inc.")—proposed a purchase of Debtor's assets in return for a release of debt, including the Lienholders' debt. Angel was not a member of the Steering Committee.

The Steering Committee's proposal involved the Debtor's assets being transferred to a purpose-created Delaware entity, Coal Acquisition LLC, later renamed Warrior Met Coal LLC ("Warrior LLC"). In exchange, the Debtor's creditors would receive equity in Warrior LLC (the "Distribution"). Additionally, Lienholders would be permitted to participate in a rights offering (the "RO"),

1

intended to raise sufficient capital to ensure Warrior LLC equity would continue to have value. The RO permitted Lienholders to acquire Warrior LLC equity at what Angel perceives as a favorable price. This acquisition was ultimately approved by order of the Bankruptcy Court dated January 8, 2016 (the "BC Order").[1] Angel did not object to the proposal in the Bankruptcy Court.

The BC Order required that the Distribution and the RO comply with securities law. To facilitate that provision, the Steering Committee and trustees for both the unsecured creditors and the Lienholders negotiated procedures for the Distribution, under which the Lienholders would be required to demonstrate entitlement to the Distribution—and, therefore, receive Warrior LLC equity—by submitting eligibility documents by a date certain, December 31, 2016. After that date, the Lienholders' rights to distribution of equity were forfeited to Warrior LLC. The documentation was required to establish, among other things, that each equity claimant was an accredited investor in compliance with SEC regulations. Notice of this condition was sent to Lienholders by Warrior LLC's agent, Kurtzman Carson Consultants LLC ("KCC"). In Angel's case, the notice was sent to his designated agent, UBS Financial Services Inc. ("UBS"). Angel did not respond and did not receive equity in the distribution.

---

[1] This order, oddly, is not attached to the Amended Complaint.

With respect to the RO, Angel alleges that he agreed to purchase Warrior LLC equity. The RO, however, required payment in cash. Angel failed to pay for the equity, and Warrior LLC did not distribute any equity to him under the RO.

In his First Amended Complaint (the "Complaint"), Angel avers that he did not receive notice of any duty to submit eligibility documents in connection with the Distribution, and that, in any event, he had a vested right to receive equity in the Distribution, without condition. With respect to the RO, he alleges that he submitted sufficient instructions for the ultimate payment of the subscription amount such that he should be deemed to have purchased equity under the RO.

In vindication of his rights, the Plaintiff serves up a dog's breakfast of claims: breach of contract against Defendant Warrior, Inc. and the members of the Steering Committee; breach of fiduciary duty against members of the Steering Committee; the tort of conversion; unjust enrichment; and declaratory judgment. The Defendants have moved to dismiss all counts and for summary judgment with relation to the breach of contract claim. What follows is consideration of those motions. I find that the unjust enrichment claim survives.

# I. BACKGROUND[2]

## A. The Parties and Relevant Nonparties

Plaintiff Joshua J. Angel is a former owner of 9.50% senior secured notes due 2019 (the "9.50% Notes") of non-party Walter Energy, Inc. (defined above as "Debtor") and a lender under the Debtor's credit agreement dated April 1, 2011 (the "Term Loan" and, together with the 9.50% Notes, the "First Lien Debt").[3]

Defendant Warrior Met Coal Inc. (defined above as "Warrior, Inc.") is a Delaware corporation with its principal place of business in Alabama.[4] It is the successor entity to Warrior Met Coal, LLC (defined above as "Warrior LLC"). Warrior Met Coal, LLC was formed under the name Coal Acquisition LLC ("Coal Acquisition"), for the express purpose of acquiring Debtor's assets via a credit bid;[5] it changed its name from Coal Acquisition LLC to Warrior Met Coal, LLC, on March 4, 2016.[6] Warrior LLC converted into a corporation, Defendant Warrior Inc., on April 12, 2017.[7]

The remaining Defendants—Apollo Global Management LLC, Ares Management LLC, Caspian Capital LP, Fidelity Investments, Franklin Mutual

---

[2] The facts, except where otherwise noted, are drawn from the First Am. Compl., Dkt. No. 41 [hereinafter "Compl."], and exhibits or documents incorporated therein, and are presumed true for the purposes of this Motion to Dismiss.

[3] Compl., at Introduction.

[4] Compl. ¶ 8.

[5] Compl. ¶ 8.

[6] Compl. ¶ 8.

[7] Compl. ¶ 8.

Advisers LLC, GSO Capital Partners LP, and KKR Credit Advisors (US) LLC (collectively, the "Steering Committee Defendants")—were all holders of First Lien Debt. These defendants later together created an *ad hoc* steering committee in connection with the Debtor's bankruptcy proceedings (defined above as the "Steering Committee").[8] The Complaint does not allege that the Steering Committee was formed pursuant to any Bankruptcy Court order, or that it operated pursuant to any governing contract or agreement.

*B. The Debtor's Restructuring*

Debtor filed for relief under Chapter 11 of the Bankruptcy Code on July 15, 2015, in the U.S. Bankruptcy Court for the Northern District of Alabama, Southern Division (the "Bankruptcy Court").[9] The Steering Committee Defendants collectively retained Akin Gump Strauss Hauer & Feld LLP ("Akin Gump) as legal counsel to represent the Steering Committee in connection with the Debtor's restructuring.[10]

---

[8] *See generally* Compl.
[9] Compl. ¶ 20.
[10] Compl. ¶ 17.

On September 3, 2015, the Steering Committee Defendants formed Coal Acquisition,[11] a Delaware limited liability company.[12] Coal Acquisition was formed "for the purposes of bidding on and acquiring a select portion of the Debtor[']s assets."[13] The Steering Committee Defendants were the sole members of Coal Acquisition at the time and, accordingly, had complete control of the entity.[14]

*C. The Genesis of the Distribution*

On November 5, 2015, Coal Acquisition entered into an asset purchase agreement to acquire the Debtor's assets, including the entirety of the First Lien Debt, in return for Class A equity in Coal Acquisition (a transaction defined as the "Distribution," above). The debt to be surrendered, per the agreement, included debt owned by non-Steering Committee Lienholders like Angel.[15]

The Bankruptcy Court established so-called "Bid Procedures" for the Distribution that meant to ensure that Coal Acquisition—the equity of which was the consideration for the Debtor's assets—had value. In particular, the Bid

---

[11] The Complaint uses passive voice, but the implication is that Coal Acquisition LLC was formed by the Steering Defendants. *See* Compl. ¶ 18 ("The Steering Committee Defendants were the sole members of Warrior LLC until the March 31, 2016 Rights Offering and [Distribution] closings."); Compl. ¶ 21 ("On September 3, 2015, Warrior LLC, then operating as Coal Acquisition [LLC], was formed . . . ."). At any rate, I make this Plaintiff-friendly assumption here.

[12] Compl. ¶ 21.

[13] Compl. ¶ 21.

[14] Compl. ¶ 18–19.

[15] Compl. ¶ 22–23.

Procedures required Coal Acquisition to show that it would be able to carry on the Debtor's business with adequate liquidity to honor its contractual obligation.[16]

*D. The Development of the Rights Offering*

To fulfill the liquidity obligation of the Distribution, Coal Acquisition pledged to raise $200 million of operating capital from existing holders of debt—*i.e.*, the rights offering defined as "RO" above.[17]  The RO offered existing Debtor stakeholders—both the unsecured creditors and the Lienholders[18]—the opportunity to purchase Class B equity in Coal Acquisition.[19]

To cover the possibility that the RO would not raise the full $200 million required by the Bankruptcy Court, the Steering Committee Defendants committed to backstopping the RO.[20]  The Steering Committee Defendants agreed to split the backstop commitment according to each Defendant's *pro rata* portion of the First Lien Debt.[21]  As consideration for the backstop commitment, the Steering Committee Defendants collectively received[22] 278,438 fully paid Class A Units of

---

[16] Compl. ¶ 26.
[17] Compl. ¶ 26.
[18] Compl. ¶ 25.
[19] Compl. ¶¶ 30–31.  The Class B Units were later converted to Class A Units, which were then collectively converted into equity in Warrior, Inc.  Compl. ¶ 54.
[20] Compl. ¶ 27.
[21] Compl. ¶ 27.
[22] The passive voice is used in the Amended Complaint and adopted here.  Compl. ¶ 28.

Coal Acquisition—equivalent to about 5% of all Class A Units fully outstanding at the time the commitment was made.[23]

*E. The Bankruptcy Court Order and Execution of the Distribution and RO*

The Bankruptcy Court approved both the Distribution and RO by order on January 8, 2016 (defined above as the "BC Order").[24]  Accordingly, representatives of the various stakeholders—including the Steering Committee, Coal Acquisition, the trustee of the unsecured creditors, and the indenture trustees for the First Lien Debt holders (defined in the Complaint as the "Indenture Trustees")[25]—then negotiated and agreed on the procedure by which stakeholders could participate in each transaction.[26]  The Complaint is entirely silent as to how, if at all, this "agreement" was memorialized, under what authority the participants presumed to act, or the terms of the "agreement," other than the "procedure" alleged to have resulted from the negotiation.[27]  For the Distribution, that procedure required existing stakeholders, including Lienholders like Angel, to provide Coal Acquisition with a credit bid eligibility letter (a "CBEL").[28]  If a Lienholder did not return the CBEL by December 31, 2016, the Lienholder's right to the equity would be

---

[23] Compl. ¶ 28.
[24] Compl. ¶ 29.
[25] Compl. ¶ 35; *see* Compl. ¶¶ 35–40.
[26] *See* Compl. ¶¶ 35–38.
[27] *See* Compl. ¶¶ 35–39.
[28] Compl. ¶¶ 35–36.

forfeited.[29]  As to the RO, stakeholders were given, for no consideration, a right to participate in the RO;[30] to exercise that right, the stakeholders were required to execute a subscription agreement ("Subscription Agreement") by March 29, 2016.[31]

After establishing the deadlines, those same representatives—which, I note, included the Indenture Trustees—agreed that the CBEL should be delivered, by Coal Acquisition, to the stakeholders in tandem with documents informing them of the RO;[32] this was done on February 25, 2016.[33]  Certain stakeholders, including Angel, did not receive either the CBEL or the RO-related documents, however.[34]  As a result of that error, the Bankruptcy Court ordered an extension of the March 29, 2016 RO participation deadline—to April 15, 2016—for the unsecured creditors, but did not extend the deadline for the Lienholders.[35]  In June 2016, the Defendants re-sent the CBELs—return of which was necessary to participate in the Distribution.[36]  Angel alleges that he did not receive this updated CBEL either.[37]

Angel filed an executed Subscription Agreement, along with the requisite paperwork, on March 28, 2016, "one day prior to the Subscription Deadline" for the

---

[29] Compl. ¶ 36.
[30] Compl. ¶ 31.
[31] Compl. ¶ 46.
[32] Compl. ¶ 38.
[33] Compl. ¶ 38.  Shortly after this, Coal Acquisition changed its name to Warrior LLC.
[34] Compl. ¶ 41.
[35] Compol. ¶ 42–43, 46; Ex. E.
[36] Compl. ¶ 48.
[37] Compl. ¶ 57.

9

RO.[38]   The Complaint alleges that, included with requisite paperwork was an instruction by Angel to wire payment for the new equity to be issued in the RO.[39] However, that is the *only* allegation as to the payment;[40] there are no details regarding the recipient of the instruction, what the instruction said, the amount (if any) authorized, or when payment was to be made—all details presumably in the possession of the Plaintiff.   In fact, the Complaint avers nothing other than the existence of the instructions—and the parties do not dispute that payment was not actually made.[41]   Angel allegedly became aware that he did not, in fact, own Warrior LLC equity when he did not receive the dividend that was issued in connection with Warrior LLC's initial public offering and conversion into a corporation, Defendant Warrior, Inc.[42]   He contacted Warrior, Inc. and Akin Gump, and first learned of the CBEL requirement through his correspondence with an Akin Gump partner.[43]

*F. Procedural History*

Angel filed his Verified Class Action Complaint for Breach of Fiduciary Duties and Breach of Contract on March 27, 2019.[44]   Following motion practice, he

---

[38] Compl. ¶ 53.
[39] Compl. ¶ 53.
[40] *See* Compl. ¶ 53.
[41] Tr. of Mar. 16, 2021 Oral Argument on Defs.' Mots. To Dismiss and for Partial Summ. J., at 14:23–15:1, Dkt. No. 75 [hereinafter "MTD Tr."].
[42] Compl. ¶ 56.
[43] Compl. ¶ 57.
[44] Dkt. No. 1.

filed a First Amended Complaint in July of 2020.[45] That complaint contains five counts: (I) Declaratory Judgment; (II) Conversion; (III) Breach of Contract related to the RO; (IV) Unjust Enrichment; and (V) Breach of Fiduciary Duty.[46] The Defendants filed a Motion to Dismiss[47] and a Motion for Partial Summary Judgment[48] only a day apart. The two motions were briefed in tandem and heard together on March 16, 2021. This opinion addresses the Motion to Dismiss, granting it for all counts except Count IV; such a ruling moots the Motion for Partial Summary Judgment.

## II. ANALYSIS

The Defendants seek dismissal under Rule 12(b)(6). At this stage, I must take as true all well-pled allegations and draw inferences therefrom in the light most favorable to the Plaintiffs.[49] I may only grant the motion if I find it not reasonably conceivable that the Plaintiffs may prevail.[50] I turn, then, to each of the five counts of the Complaint, albeit out of order as presented in that pleading.

---

[45] Dkt. No 41.

[46] Compl. ¶¶ 68–100.

[47] Dkt. No. 63.

[48] Dkt. No. 64.

[49] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011).

[50] *Id.* at 536. In a recent Memorandum Opinion, I referred to "reasonable conceivability" using the venerable English term "plausible." *In re Oracle Corp. Deriv. Litig.*, 2021 WL 2530961, at *2 (Del. Ch. June 21, 2021). I am well aware that our Supreme Court has rejected the federal standard applied to motions under Rule 12(b)(6)—denominated a "plausibility" standard—in favor of the Delaware standard, "reasonable conceivability." *See Cent. Mortg.*, 27 A.3d at 537. It is of course within the purview of the Supreme Court to provide the standard under which a pleading, attacked for failure to state a claim, shall be reviewed; my review here, as in *Oracle*, is made under

*A. Count III, for breach of contract, must be dismissed.*

In Count III, the Plaintiff alleges that a contract exists between the Defendants—that is, the Steering Committee Defendants who are fellow Lienholders and Warrior, Inc.—and Angel, the Plaintiff Lienholder, because the Defendants used Angel's portion of the first lien debt to obtain the BC Order implementing the Distribution and RO.[51]   This supposed contract allegedly "contractually entitled" Angel both "to receive adequate notice of the Rights Offering and the distributions emanating therefrom"[52] and to receive Warrior LLC equity via the Distribution.[53]

the "reasonable conceivability" standard—that is, assuming the truth of the allegations, together with plaintiff-friendly inferences, I may only dismiss if I find that the plaintiff is nonetheless unable to recover "under any reasonably conceivable set of circumstances." *Cent. Mortg.*, 27 A.3d at 535. I occasionally use the term "plausible" herein, but not to refer to the federal standard set out in *Twombly* and *Iqbal* and rejected by *Central Mortgage*. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Instead, I use the term "plausible" because, in my perhaps modest understanding of English, it is a synonym of "reasonably conceivable," and is clearer and better English usage than the double-barreled term.  "Plausible," in this context, per the Shorter Oxford English Dictionary, means "Having a show of truth, reasonableness or worth."  2 The Shorter Oxford English Dictionary 1603 (3rd ed. 1973).  With that adjective describing a claim, then, the claim is plausible if it has an appearance of reasonableness.

In any event, I have applied the Delaware standard of reasonable conceivability, as I understand it, throughout.  Per *Central Mortgage*, the federal 12(b)(6) standard requires something "beyond mere 'possibility' but short of 'probability[,]'" while the Delaware "governing standard of conceivability is more akin to 'possibility.'"  Accordingly, as I understand this pronouncement, a claim survives if its success appears possible to a rational objective observer.  Where this decision dismisses a claim, it is under that standard.

[51] Compl. ¶ 80.
[52] Compl. ¶ 80.
[53] Compl. ¶ 81.

12

I confess to some confusion as to the source of this alleged agreement; that the Plaintiff's property—his share of the First Lien Debt—was implicated in a court order does not, to my mind, create a contract. The facts, as I understand them from the Complaint, are thus: The BC Order approved a transfer of the Debtor's assets to Warrior LLC as fair to the creditors, in that they would receive equity in Warrior LLC in return for the sublimation of their debt; the Lienholders would, via the Distribution, receive equity *pro rata* to their secured debt. The Bankruptcy Court did not address the terms under which the Distribution would be made, other than to require it to comply with securities law.[54] The Steering Committee, a subgroup of the Lienholders, were to be the initial members of Warrior LLC pending the distribution.[55] They negotiated terms with fiduciaries appointed by the Bankruptcy Court—one for the Lienholders and one for the unsecured creditors—and arrived at a condition whereby the Lienholders would submit documentation proving that they were accredited investors, so that the Distribution would qualify as a private placement under the securities regulations.[56]

Warrior LLC sent notice of the Distribution through its agent, KCC, in March 2016, informing the Lienholders that they must return documentation, including an

---

[54] Compl. ¶¶ 29–30.
[55] Compl. ¶ 18.
[56] Compl. ¶ 34.

executed copy of the CBEL, a draft eligibility letter.[57] That notice encouraged the Lienholders to submit the documentation by March 20, 2016, in order to timely receive their share of the Warrior LLC equity, but made clear that the right to receive their share of equity would be forfeit absent compliance by December 31, 2016.[58] The parties do not dispute that Angel did *not* provide the requisite paperwork.[59]

Although the parties do dispute whether and when Angel received actual notice, I accept, for purposes of this motion, the allegation that the notice was sent to an ineffective email address for Angel's agent, and that he never received that notice. Angel alleges the Defendants breached a contractual duty to ensure that he received both notice of the RO[60] and his *pro rata* share of Warrior LLC equity,[61] in light of the fact that his lien against Debtor was cancelled.

The problem is, Angel is unable to identify the contract. He suggests that an amorphous blend of the indenture agreement under which he became a debtor entity Lienholder, the BC Order, Warrior LLC's Operating Agreement, and equity, read together, require that he receive both proper notice and his share of interest in Warrior LLC; but he is unable to frame a cogent explanation of an actual contract, express or implied, that was breached. The indemnification agreement between the

---

[57] Compl. ¶¶ 34–36.
[58] Compl. Ex. C, at 2.
[59] *See* Compl. ¶ 58.
[60] Compl. ¶ 80.
[61] Compl. ¶ 81.

Lienholders and the Debtor does not bind Warrior LLC. The BC Order is a court order, not a contract. And nothing in the LLC Operating Agreement provides for distribution without documentation.

Angel does point out that the BC Order provides that Lienholders "shall receive" equity in Warrior LLC.[62] But, again, that assertion is not an allegation of breach of contract, but rather a claim that the BC Order was breached.[63] The BC Order is, manifestly, not a contract. To the extent that Angel believes that any defendant violated the BC Order, nothing in this decision is in prejudice of his right to seek relief from the Bankruptcy Court. But to succeed under a contract theory, a plaintiff must, at minimum, point to a meeting of the minds between the parties, mutual consideration, and a promise to perform. Such a contractual relationship is absent here. Finally, to the extent Angel makes a contractual argument as to the RO, the Complaint fails to allege that Angel's failure to pay—the fatal flaw to his participation in the RO—was related to the inadequate notice. Angel returned the

---

[62] Pl.'s Answering Br. to Defs.' Mot. to Dismiss First Am. Compl. 14, Dkt. No. 68 [hereinafter "MTD AB"].

[63] To the extent that the Complaint argues that the decisions jointly made by the Steering Committee, the Indenture Trustees, and the trustees for the unsecured creditors to effectuate the BC Order were not followed, those allegations do not point to any agreement or understanding, the terms of which were breached. In other words, if the Complaint alleged that some parties created a contractual distribution protocol to which Angel was a party or third-party beneficiary, that was subsequently breached to Angel's detriment, that could presumably state a claim. But such a protocol is not pled in the Complaint, nor can I infer such even at the pleadings stage, based on the allegations here.

15

requisite paperwork to participate in the RO in a timely fashion.[64] The Complaint does not explain why, or even assert that, the allegedly inadequate notice, sufficient for his return of the requisite paperwork, was insufficient to allow him to pay for his participation in the RO.

*B. Count V, for breach of fiduciary duty, must be dismissed.*

As with his breach of contract claim, Angel has failed to perfect this claim for the most basic of reasons: here, a failure to establish fiduciary duty. Count V appears to allege that the Steering Committee Defendants owed the Plaintiff fiduciary duties because the Plaintiff was entitled to become an owner of Warrior LLC Class A units and the Steering Committee Defendants were controlling equityholders of Warrior LLC.[65] In particular, the Complaint alleges: (1) that the Steering Committee Defendants acted as the alter ego of Warrior, Inc., Warrior LLC, and Coal Acquisition and, accordingly, owed the Plaintiff fiduciary duties by holding themselves as acting on the behalf of the Lienholders;[66] (2) that Warrior LLC's Operating Agreement provides for the same fiduciary duties that a Delaware corporation owes;[67] (3) that the Steering Committee Defendants controlled Warrior LLC by virtue of their majority equity ownership;[68] (4) that, by virtue of their control

---

[64] Compl. ¶ 53.
[65] *See* Compl. ¶¶ 93–96.
[66] Compl. ¶ 93.
[67] Compl. ¶ 94.
[68] Compl. ¶ 95.

16

of Warrior LLC, the Steering Committee Defendants owed fiduciary duties to Warrior LLC equityholders;[69] and (5) that Angel was entitled to become such an equityholder.[70] Angel also alleges that he "reposed a special trust in the Steering Committee to act in his best interest because the Steering Committee was privy to non-public and highly detailed information concerning" the Debtor—a special trust that "likewise gave rise to fiduciary duties."[71]

None of these allegations suffice to establish fiduciary duties. A sufficient pleading that the Steering Committee Defendants owe fiduciary duties to the Warrior LLC equityholders requires two allegations: first, that the Steering Committee Defendants acted in concert in "some legally significant way," thus forming a control group,[72] and second, that they exerted control over the managers of Warrior LLC.[73] The former is alleged throughout the Complaint, albeit without any specificity—in fact, the actions of *individual* members of the Steering Committee

---

[69] Compl. ¶¶ 95–96.
[70] Compl. ¶ 96.
[71] Compl. ¶ 97.
[72] *In re Hansen Med., Inc. S'holders Litig.*, 2018 WL 3030808, at *5 (Del. Ch. June 18, 2018); *Dubroff v. Wren Holdings, LLC*, 2009 WL 1478697, at *3 (Del. Ch. May 22, 2009) ("Although a controlling shareholder is often a single entity or actor, Delaware case law has recognized that a number of shareholders, each of whom individually cannot exert control over the corporation (either through majority ownership or significant voting power coupled with formidable managerial power), can collectively form a control group where those shareholders are connected in some legally significant way[—]e.g., by contract, common ownership, agreement, or other arrangement[—]to work together toward a shared goal." (italics added)).
[73] *Lacey on behalf of S. Copper Corp. v. Mota-Velasco*, 2021 WL 508982, at *10 n.110 (Del. Ch. Feb. 11, 2021); *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *9 (Del. Ch. Apr. 20, 2009) ("First, to have any fiduciary duties to an entity, the affiliate must exert control over the assets of that entity.").

are never propounded. The latter determination—that the will of the managers of Warrior LLC was overborne concerning the Distribution—is *entirely absent* from the Complaint; indeed, the Complaint fails even to disclose the identities of the Warrior LLC managers, much less how they were beholden or controlled by the alleged control group. The Complaint utterly fails to show that the Steering Committee Defendants, acting as a group, exerted their control to force Warrior LLC to act concerning the Distribution.

Even assuming the Steering Committee Defendants seized control of Warrior LLC with regard to the Distribution, the Complaint is silent as to what duty may have been breached, other than failing to ensure that Angel received proper notice. The Complaint alleges that the Steering Committee and fiduciaries for the creditors agreed to a notice provision to implement the BC Order, that responsibility for such notice was given to Warrior LLC (then-Coal Acquisition), and that Warrior LLC delegated its notice responsibilities to an agent, KCC. KCC then sent Angel's notice to a bad email address. What duty was breached by the Steering Committee Defendants in this scenario is not stated or implied in the Complaint.

Further, Angel's allegations of breach of fiduciary duty in this regard fail for one fundamental reason: he is not, and was not, an owner of Warrior LLC units. In fact, the entire basis for Angel's Complaint is that he *never* received that equity, even though he was entitled to it. Thus, even if the Steering Committee Defendants did

18

owe fiduciary duties to Warrior LLC equityholders, those fiduciary duties would not run to Angel, who was and is not a Warrior LLC equityholder.

Finally, Angel alleges that the Steering Committee Defendants owe him fiduciary duties apart from their role as supposed *Warrior LLC* fiduciaries. He alleges that he accorded the Steering Committee Defendants a "special trust," in that they had confidential information related to the transaction for the benefit of the Lienholders.[74] But it is implausible that the Debtor's Lienholders reposed a special trust in the Steering Committee Defendants. Rather, the Lienholders had their *own* representatives that *did* owe them fiduciary duties and who participated in the drafting and execution of the Distribution and RO participation procedures—the Indenture Trustees.[75] In fact, the Indenture Trustees—not the Steering Committee Defendants—were responsible for preparing the February 25, 2016 CBEL cover letter to the Lienholders.[76] Angel has not sued the Indenture Trustees, even though they signed off on the Distribution documentation requirements on his behalf.

Angel complains that, under the BC Order, he was entitled to Warrior LLC equity; he criticizes the documentation requirement as unwarranted, but his real complaint is that he failed to receive actual notice because that attempted notice—with which he could easily have complied—was sent to the wrong email address.

---

[74] Compl. ¶ 97.
[75] Compl. ¶ 35; *see* Compl. ¶¶ 35–40.
[76] Compl. ¶ 40.

That harm is not one that sounds in breach of fiduciary duty under the facts pled, and Count V must be dismissed.

*C. Count II, for conversion, must be dismissed.*

Count II of the Complaint alleges that the Defendants wrongfully exerted dominion over the Plaintiff's "Warrior Class A and Class B Equity, Warrior Common, and their *pro rata* share of the cash dividend paid in connection with the IPO."[77]  In other words, Count II alleges that the Defendants converted not only the Plaintiff's share of the First Lien Debt, but also (a) the Warrior LLC equity that his share of the debt entitled him to under the Distribution; (b) whatever the Plaintiff would have bought in the RO if he had, in fact, perfected his participation; and (c) any benefits accruing from his resulting ownership of Warrior LLC equity.

The tort of conversion applies to goods held by another in which the plaintiff has a present right of possession.[78]  In order to state a claim for conversion, then, Angel must establish that he had a present right of possession in either the Class A equity he would have received from the Distribution, or the Class B equity he would have received from participating in the RO.  He has failed to establish a present right of possession of either.

---

[77] Compl. ¶ 75 (italics added).
[78] *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 889 (Del. Ch. 2009).

20

As to the Distribution, the Class A units were held by Warrior LLC; they were not disbursed to Angel. The representatives of the Debtor's stakeholders—including the Indenture Trustees that represented Lienholders like Angel—agreed (per the Complaint) that certain documentation must be returned by each of the Lienholders in order to receive Warrior LLC equity under the Distribution.[79] Angel failed to return the requisite documentation before the forfeiture date; accordingly, he did not have a present right of possession of Class A equity. There was no property of Angel in hand that had been converted by Warrior LLC (now Warrior, Inc.). If Angel's forfeiture of the right to attain the equity was wrongful, the relief is not in conversion, therefore.

As to the RO, again, the stakeholder representatives agreed that certain documentation *and payment* must be received by a date certain—March 29, 2016.[80] Angel provided the documents,[81] but did not make payment.[82] Because he did not comply with the RO's participation requirements, he does not have a present right of possession of the Warrior LLC Class B equity that he would have purchased had he tendered payment. Accordingly, Angel has failed to state a claim for conversion.

---

[79] Compl. ¶¶ 35–38.
[80] Compl. ¶ 46.
[81] Compl. ¶ 53.
[82] Compl. ¶ 53; MTD Tr. 14:23–15:1.

## D. Count IV, for unjust enrichment, survives.

Unjust enrichment is an equitable remedy, applicable where, as here, a court cannot identify a remedy at law.[83] It further requires an enrichment, a related impoverishment, and the absence of justification.[84] This claim, alone, is well-pled.

Angel alleges that the Defendants were enriched, and he was impoverished, because the Steering Committee Defendants and Warrior LLC caused his entitlement to Warrior LLC equity—through his share of First Lien Debt—to be extinguished.[85] They did so, per Angel, by allowing their agent to attempt notice using improper email addresses, thus failing to provide actual notice, and thereby causing Angel to forfeit his entitlement to Warrior LLC equity under the Distribution. The Complaint alleges that the use of the bad addresses was unjustified and, perhaps, purposeful. As a result, Angel has lost his inchoate right to Warrior LLC equity, and that equity remains with a Warrior entity or has been acquired by the Steering Committee Defendants as part of their backstop commitment.[86]

I have found that the Plaintiff has failed to state a claim for breach of contract, breach of fiduciary duty, or conversion. There does not, in my view, appear to be adequate remedy at law. The Steering Committee Defendants and Warrior LLC

---

[83] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).
[84] *Id.*
[85] Compl. ¶¶ 87–88.
[86] The Complaint is silent as to the current owner of the equity—now converted to Warrior, Inc. stock—to which Angel was originally entitled.

22

(now Warrior, Inc.) have been enriched to Angel's detriment, through their purchase or retention of his forfeited Warrior LLC equity. Further, I note that it should have been apparent to Warrior LLC that no reason existed for a Lienholder to fail to provide documentation—which was the *only* step needed to receive the *only* possible compensation for the Lienholders' lost rights against the Debtor. If Angel proves that the notice as given was wrongful, leading to the Defendants' enrichment and Angel's impoverishment, an equitable claim to unjust enrichment will lie. I note that this unjust enrichment claim can only apply to the Distribution, and not to the RO, because, as noted above,[87] the Complaint makes no allegation that inadequate notice led to Angel's failure to participate in the RO—*i.e.*, his failure to pay.

*E. Count I, for declaratory judgment, must be dismissed.*

Finally, Angel makes a claim for a declaratory judgment that the Steering Committee Defendants owed fiduciary duties to Angel, that those fiduciary duties were breached, and that the Defendants impermissibly conditioned eligibility to participate in the RO on receipt of the Distribution CBEL.[88] I have already determined, under the facts pled, that I cannot conclude that the Steering Committee Defendants breached fiduciary duties to Angel. The declaratory-judgment analog of that claim is moot. The final request for declaratory judgment is entirely duplicative

---

[87] *See* Section II.A. *supra*.
[88] Compl. ¶ 69.

of the unjust enrichment claim, and resolution of that claim will moot the declaratory judgment claim.[89] Accordingly, the Plaintiff's count for declaratory judgment must be dismissed.

## III. CONCLUSION

For the foregoing reasons, the Motion to Dismiss is granted as to Counts I, II, III, and V; it is denied as to Count IV. The parties should submit an appropriate form of order.

---

[89] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *29 (Del. Ch. Nov. 26, 2014), *judgment entered*, (Del. Ch. 2014).